UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MICHELLE C. GABLE,<br><br>                        Plaintiff,<br><br>    v.<br><br>WASHINGTON STATE CORRECTIONS CENTER FOR WOMEN, et al.,<br><br>                        Defendants. | Case No. 3:18-cv-05266-RBL-TLF<br><br>**REPORT AND RECOMMENDATION**<br><br>**NOTED FOR JULY 6, 2018** |

This matter comes before the Court on plaintiff's motion for a temporary restraining order ("TRO")/preliminary injunction (Dkt. 7) and an emergency motion for a TRO/preliminary injunction (Dkt. 12). For the reasons set forth below, the undersigned recommends the Court deny both motions.

I.   **FACTS**

Plaintiff, a prisoner at the Washington Corrections Center for Women (WCCW), has filed a civil rights complaint under 42 U.S.C. § 1983, for violations of her Eighth Amendment rights and rights under the Americans with Disabilities Act (ADA). Dkt. 3, Complaint (containing allegations certified by declaration under oath as true by the plaintiff). Plaintiff alleges she suffers from a chemical injury disability resulting from a significant chemical exposure that

REPORT AND RECOMMENDATION - 1

occurred in 1998. Dkt. 3 at 5. She further alleges that her disability is "medically documented," and specifically that she has been diagnosed with such by medical practitioners, including a specialist in the research and treatment of chemical injuries.[1] *Id.* at 5.

Plaintiff asserts that she was transferred to the WCCW from the Montana Women's Prison (MWP). *Id.* Plaintiff states that while at the MWP in 2015, she went to a physician (outside of prison) who confirmed the above diagnosis. *Id.* Plaintiff also states MWP authorities agreed to accommodate her chemical sensitivities by: allowing her to return to her cell if she became sickened by a chemical exposure, giving her baking soda with which to wash herself and her clothes, and housing her in the smallest housing unit to limit exposures. *Id.*

Plaintiff alleges that she experiences a range of symptoms when exposed to chemicals, which can last from hours to days, and which include severe and intractable chest pain, difficulties breathing, light mindedness, weakness, burning sensations in her eyes, nose and throat, and confusion. *Id.* According to plaintiff, she has a physician's note that "a significant exposure can be life threatening," and that "repeated lower exposures can render [her] even more permanently disabled." *Id.* Plaintiff also alleges that she gave MWP prison authorities another physician's note – the note indicates she is entitled to a reduced exposure living environment as a reasonable accommodation under the ADA.[2] *Id.*

Plaintiff alleges that since her arrival at the WCCW, authorities have refused to accommodate her disability, instead treating it as a mental health issue. Dkt. 3 at 6. Plaintiff alleges that from December 21, 2017, to January 22, 2018, she was housed in the Close

---

[1] Plaintiff, however, has not provided any such documentation either with her complaint or her two motions for a TRO and/or preliminary injunction.

[2] Again, though, no actual medical documentation to support these assertions has been provided.

REPORT AND RECOMMENDATION - 2

Observation Area, a small mental health unit with only nine cells but no fresh air. *Id.* She then was placed in the Temporary Housing Unit ("THU"), another small housing unit for offenders waiting for permanent housing. Dkt. 3 at 6.

Plaintiff alleges that she was moved to a Reception and Diagnostic Center at the WCCW ("RDC-B"), a larger housing unit where newly arrived offenders are housed as they proceed through orientation and classification, on January 29, 2018. *Id.* Plaintiff alleges the ventilation in RDC-B was poor and that airborne chemicals were so strong she "experienced immediate difficulties." *Id.* Plaintiff asserts that despite the "obvious distress" she was in, she was not transferred immediately to a different housing unit -- although she eventually was moved to a "well-ventilated cell in "RDC-A", a unit half RDC-B's size, where she "did very well." *Id.*

Plaintiff's asserts that because RDC-A houses fewer offenders, there are fewer exposures to personal hygiene items, cleaning products, and other supplies containing chemicals. *Id.* She asserts that on February 28, 2018, authorities moved her to the Close Custody Unit ("CCU"), which houses over 100 offenders, which she assets exposed her to a significant variety of cleaning and other chemical products. *Id.* at pp. 6-7. This caused her to immediately experience chest pain and breathing issues. *Id.* at p. 7. Plaintiff alleges that the severe pain and suffering she endured caused her to be sickened to the point where she contemplated ending her life. *Id.*

Plaintiff asserts that later on the same day she was moved to the CCU, she was transferred to the Close Observation Area "for safety", where she states she has remained ever since.[3] *Id.* Plaintiff alleges that while she does well in the smaller housing units, such as the

---

[3] Plaintiff states she was sent back to the CCU on March 26, 2018, and forced to sit in that unit's day room, being exposed to the unit's chemicals, and speak with a mental health professional to work through her physical reactions,

REPORT AND RECOMMENDATION - 3

Close Observation Area (COA), she is subject to the threat of being sent back to the CCU at any time. Dkt. 3, pp. 7, 9; Dkt. 12.

In her complaint, in addition to costs and damages, plaintiff requests injunctive relief -- an order requiring defendants to house her in a smaller unit, and in a single cell with no cellmate, while still allowing her to participate in all programming activities enjoyed by the WCCW general population. Dkt. 3, p. 11. She further seeks accommodation in the form of: being permitted to immediately leave an area or activity and return to her housing unit when she feels sickened, being allowed to use a sleeping mat that does not exacerbate her chemical sensitivities, and an injunction against defendants from threatening to return her to the CCU. *Id.* In both of her TRO/preliminary injunction motions, plaintiff seeks to prevent defendants from carrying out that alleged threat. Dkts. 7, 12.

The defendants responded to plaintiff's motion and submitted a supporting declaration of Dr. Carei. Dkt. 10, 11. According to Dr. Rain Carei (a psychologist employed by the Washington State Department of Corrections at the WCCW and one of plaintiff's primary mental health therapists) plaintiff received a diagnosis – while in Montana -- for "toxic encephalopathy" and some other diagnoses from a naturopath outside the prison. The WCCW medical providers have not made this diagnosis. Dkt. 11, pp. 1-2. Dr. Carei states that plaintiff has been diagnosed with reactive airway disease. *Id.* at 2. Standard treatment interventions have been offered by medical providers for reactive airway disease, and a previous medical provider had recommended she

---

but was then returned to the COA after having to experience painful burning in her eyes, nose and throat, as well as substantial chest pain throughout the night. Dkt. 3, p. 7.

REPORT AND RECOMMENDATION - 4

"avoid general irritants (i.e. new paint, manufacturing or industrial products), agricultural areas, and areas with heavy vehicular traffic."[4] *Id.*

Dr. Carei states that WCCW is located in a non-agricultural wooded area, surrounded by Puget Sound, with "very good" air quality. *Id.* Plaintiff's housing "is separated significantly from vehicular traffic." *Id.* Dr. Carei asserts there are not a lot of chemicals, WCCW "utilizes sustainable practices as a general operating principle," and that plaintiff only complains about her physical health when discussing being moved to the general population area of the prison, CCU. *Id.*

Dr. Carei also asserts that plaintiff was housed in the Treatment and Evaluation Center ("TEC") – a restrictive therapeutic setting – for one day upon her admission to the WCCW. *Id.* Dr. Carei asserts that Plaintiff has a documented diagnosis of somatic symptom disorder, (Dkt. 11-1, Exhibit 1, (Mental Health Treatment Plan) at 2, Exhibit 3 (Primary Encounter Report) at 2); Dr. Carei also opines that if plaintiff returns to the TEC it would not be therapeutically beneficial -- doing so "would further bolster her belief that she is unable to manage her anxiety or function independently." *Id.* at 2-3. Dr. Carei asserts the WCCW's mental health team has worked with plaintiff over the past several months to create an individual behavior plan "to support her to manage her anxiety and discharge [her] to a less restrictive setting." Dkt. 11 at 3; Dkt. 11-1, Exhibit 2.

According to a Primary Encounter Report dated March 10, 2018, and completed by Dr. Carei, plaintiff was cooperative and in "good spirits." Dkt. 11-1, Exhibit 3, at 1. Plaintiff made occasional jokes, had written "more positive things" on her wall, exhibited normal speech, and

---

[4] Defendants also have not provided documentation of this recommendation or either of the above diagnoses.

REPORT AND RECOMMENDATION - 5

denied current suicidal ideation. *Id.* at p. 2. She made no further threats to herself and felt her Individual Behavior Management Plan, which involved transitioning to the CCU that same day, was within her abilities. *Id.* Exhibit 2 at 2, Exhibit 3 at 2. Plaintiff indicated she was looking forward to the transition, the beginning of which was "successful, despite challenges." *Id.*, Exhibit 3, at 1-2.

Dr. Carei states plaintiff's current mental health providers and WCCW staff generally agree she "is suitable for placement in the general population setting." Dkt. 11 at 3. Dr. Carei also asserts that general population placement would allow plaintiff to progress in her mental health treatment, take advantage of greater programming opportunities, and "make a life for herself" in a manner "that promotes growth and as much freedom as possible within a correctional environment." *Id.* at 3-4. Dr. Carei also states that if plaintiff's condition changes, WCCW medical, mental health, and other staff are able to respond quickly to ensure plaintiff's continued safety and well-being. *Id.* at 4.

II. **DISCUSSION**

The test for determining whether a plaintiff has made a sufficient showing for the Court to grant preliminary injunctive relief[5] is:

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).

---

[5] The standard for determining whether to grant a temporary restraining order is the same as that for determining whether to grant a preliminary injunction. *Verified Nutrition, LLC v. Sclar*, 2017 WL 4785948, at *2 (C.D. Cal. Oct. 23, 2017) (quoting *Brown Jordan Intern. V. Mind's Eye Interiors, Inc.*, 236 F.Supp.2d 1152, 1154 (D. Haw. 2002)).

REPORT AND RECOMMENDATION - 6

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). In the alternative, the plaintiff may obtain such relief by showing either: (a) a combination of likely success on the merits and the possibility that he or she will suffer irreparable injury; or (b) that serious questions have been raised as to the merits of the plaintiff's claims, and the balance of hardships tips sharply in his or her favor. *Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012).

The focal point of both tests, however, is the existence and degree of irreparable injury. *Oakland Tribune, Inc., v. Chronicle Publ'g Co.,* 762 F.2d 1374, 1376 (9th Cir.1985). If the party seeking preliminary injunctive relief has not shown irreparable harm, the request for such relief may be denied on that basis alone. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011); *Oakland Tribune, Inc.*, 762 F.2d at 1376 ("[u]nder any formulation" of the above tests, the moving party "must demonstrate that there exists a significant threat of irreparable injury").

"Speculative injury does not constitute irreparable injury sufficient to warrant granting preliminary relief." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir.1988). The moving party "must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.*" Id*. Further, a preliminary injunction is "an extraordinary and drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE & PROCEDURE § 2948, pp. 129-30 (2d ed.1995)) (emphasis added by the Supreme Court); *Winter,* 555 U.S. at 9 (2008).

The court must proceed with caution when considering motions for preliminary injunctive relief in cases involving the administration of state prisons. *Turner v. Safley*, 482 U.S. 78, 85 (1987); *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000). In addition, pursuant to the

REPORT AND RECOMMENDATION - 7

Prison Litigation Reform Act, any grant of prospective relief in regard to prison conditions must be narrowly drawn, extend no further than necessary, and be the least intrusive means necessary for correction. 18 U.S.C. § 3626(a)(1)(A); *see also Gomez v. Vernon,* 255 F.3d 1118, 1129 (9th Cir. 2001).

Here, plaintiff has not carried her burden of clearly demonstrating that the facts establish the existence of irreparable harm. While plaintiff asserts she has a medically documented sensitivity to chemicals, she provides no documentation. In addition, although defendants acknowledge plaintiff received a diagnosis of toxic encephalopathy from an outside naturopath while she was in Montana, medical providers at WCCW have not made such a diagnosis.

Defendants further acknowledge that plaintiff has been diagnosed with reactive airway disease, but assert that she has been offered standard treatment options. Although no medical documentation of that condition has been provided, plaintiff has not denied that those options have been offered or that they are inadequate for that condition. Defendants acknowledge a prior medical provider recommended that plaintiff should avoid general irritants, agricultural areas, and areas with heavy vehicular traffic. Plaintiff has contested neither the assertion that the WCCW is located in a non-agricultural area nor the statement that her housing is significantly separated from vehicular traffic.

Although plaintiff disagrees with the assessment that WCCW's air quality is "very good" (she asserts chemicals are being used by inmates and others within the prison that result in her experiencing significant physical ailments), she has not shown the facts *clearly* favor her on this issue. Further, there is documented evidence that she has been diagnosed with a somatic symptom disorder, which may account for her symptom complaints. According to Dr. Carei,

REPORT AND RECOMMENDATION - 8

plaintiff appears to complain about them only when discussing a return to general population.[6] Further, treatment records indicate plaintiff is no longer expressing or threatening a desire to self-harm, and seems motivated to make the transition to the CCU and general population.

Because plaintiff has not provided facts to clearly demonstrate she will suffer irreparable harm if defendants are not prevented from returning her to the WCCW general population, she is not entitled to the preliminary injunctive relief she is requesting.

III.   **CONCLUSION**

Based on the foregoing discussion, the undersigned recommends that plaintiff's motions for a temporary restraining order and/or preliminary injunction (Dkts. 7, 12) be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and FRCP 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections. *See also* FRCP 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by FRCP 72(b), the Clerk is directed to set the matter for consideration on **July 6, 2018,** as noted in the caption.

**DATED** this 18th day of June, 2018.

*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge

---

[6] Under the mental health problems section of her Individual Behavior Management Plan, it additionally states that plaintiff "expresses mental stress in a physical way (feeling her lungs are on fire, believing she cannot breathe when near certain plastics, etc.)." Dkt. 1-1, Exhibit 2, p. 2.

REPORT AND RECOMMENDATION - 9